I'm going to start by saying that we're here because I believe it's important to overturn the district court decision by Judge Mendez. We are very clear, we think and hear, and we hope that White v. Metropolitan Life Insurance as opposed to Blacks in the same space. We have no use of life health policy and not a health policy like White v. Life Insurance. Is there anyone in the position you lack that was applicable? No, we don't. We don't have any Blacks in this class. We don't have Blacks in this class because there's a health policy. And because of course, Blacks is never reinstated as a group. One of the unique facts of this case is that not only was there the whole life policy issued as a premium paid for on November 3rd, the policy actually came out December 11th, but then in the end of January, MEDEC decided to put Ms. Reynolds back into the group policy. And then she qualified at that point, correct? That's correct. And so, and the group, the ERISA planned group policy said that you can't have both, right? Once you convert, you can convert, that's fine, but you only get one payment. You can't get a payment under both the group and the converted policy. So how could you ever have a one payment provision if, based on your argument, Blacks applies and that's a standalone policy. Can you get the payment regardless? If you get one payment provision, it's not enforceable. How can that be? They're not saying you can't have two policies. And in fact, they sold her two policies and then they go back after she passed away and said, well, we decided we're only going to give you one payment. It doesn't matter how many policies. I mean, that's our argument. It doesn't matter how many policies. It's only how much premium they took from you. No, no. What they're really saying is you had a group policy. You lost your job and you were not going to be covered by the group policy anymore, and there was a risk of that because your condition hadn't lasted long enough. We'll put you on an individual policy because under the group policy you can convert, but you can't have both. You can't recover under both. So then when she's eligible again, they put her back on the group policy and say, but under the one payment provision, you only get paid out once. We'll give you back your premiums for your individual so you're not out any money and we'll pay out under the policy, but you can't get paid out under both, and that's an ERISA-pertinent provision in the plan. Right. Well, that's true. But what we're having here, I think this goes over a couple steps, and the way this goes over the steps is on January 27th of 2009, they stop taking the premium out of her. They can sit out now. They're complying with their one payment provision by saying, all right, we'll pay you back in the group. We're not going to take your premium anymore for the individual policy. Whether or not they're really allowed to cash the whole-life policy is a whole different ball of wax. We're not here for it. I think it's implausible that you can sell your security and pay me back, but let's go to after January 27th. Ms. Reynolds calls up and says, hey, can I keep the individual policy? The whole-life policy is going to cash value. It's an investment. I have to keep it. And that's his own issue. And as of February 1, we heard their own agent calls up the trustee of Ms. Reynolds' trust and says, yes, you can keep both policies. And it didn't cut into the whole-life policy. March 2, they took your premium. They took $2,800 from our checking account to cover premium for February and March of 2009. And that was a one-period plan. That plan was enforceable. And they knew about her. They knew everything about her. Just to point out, I mean, she was a long-term disability claimant. They had evaluated her for deliverable premium. So they knew they had to medically underwrite this. They had to pay for medical information. And can they say, look, I'm going to pay the premium, and you can have this policy. Can I ask you? Of course, I lost your apartment, but I wanted to make sure you didn't lose it. So if you, as the purchaser of the house, basically could not get payment of that coverage on both rents, so for a particular key, let's say you sell your apartment for $3,000, we're taking them at their word. You're not going to get payment, but it's $400,000 or $1,000, and you have $400,000 in the future. So if that's not going to happen, is there a reason why the Supreme Court wanted one of us to compute the premiums on the whole-life policy? That's what I'm trying to figure out. Well, the reality of it is, I'm sure she didn't know nothing about payment. No one did. She didn't read it, and she doesn't have knowledge of knowing what was in the plan. I'm sorry to say this, I'm going to have to discount you a little bit. Your position is that she thought by when MetLife said, we'll take the payments and you start taking the federal remarks, that she was buying basically double coverage. She was buying the same insurance policy. Many people have lost insurance policies. So does that get on the amount? Yeah, no, no, it doesn't get on that. All I'm asking you, I'm going to get your opponents the better one to ask, if you were not going to get a double payout, is there some other reason, nonetheless, why you would want to have the whole-life policy there in place? Just in case somehow you didn't get payment earlier than your policies, or some circumstance that she was protected against, that it makes sense for her to pay the premiums on the whole-life policy, even though there would be no circumstances for her to pay that. Absolutely. And here's what it is. Her employer, she didn't get turned in. She was there. She was a lawyer. She would have to find another job. If she was on disability, let's assume that she wasn't disabled until she died. Believe me, that wasn't the plan. Okay, so she gets involved with disability in some way. She's in the group doing it. She's got a group to turn life policy. She is on disability. She doesn't have her employer to go back to. She's in the life insurance policy. That's what it says here. So she gets no benefits. That's what my daughter said. Okay, I'll be with this. I love that. So let's say that happens. She gets terminated. There's an extroversion right kicks in, so she's not going to be paid. Am I wrong on that? Because that's what my daughter said. Why would she waste her money, pay $1,400 a month in the interim, when even if that very unfortunate circumstance occurred where she thought, oh, my God, I might lose life insurance altogether, wouldn't she then have the right to convert to policy? Conversion, right? Would she agree to pay me? You can tell her what I meant by that. So she didn't have to pay for any of the group policy, as long as she remained disabled. And there's a whole convoluted list of things, whether or not you're disabled. If she is, God forbid her. And within a year, was no longer disabled. Men life decides, you know what, I'm not paying you benefits anymore because you are no longer disabled. Get out and go to work. Group policy just came through. Her employer is no longer a business. If she doesn't find another job that has a group policy that has no pre-existing conclusions about any solutions, she doesn't have life insurance anymore. She worked her whole life, and now she'll find herself at 55 years old with no life insurance for her two and a half children. So there was a great reason they had that policy because that policy said it was the answer. She was 100. They couldn't, I mean, all the representations in that policy say that they can't take it away. And that's what an argument is that we make here. I mean, men life has asserted that the language of all men policies is irrelevant, right? Well, it's not the image of the group policy, though. It wouldn't have taken it away, right? It's only because it's one true provision in the group policy that she only gets paid once. If she hadn't gone back on that group policy, she would have been able to be paid out into the individual policy, right? They're not arguing. That's right. And I think what I think the judge's first answer was why would she even want to pay that much money for a blind policy? And I think your question goes to, well, she died, so she got paid. And the whole purpose of insurance is a risk, right? Nobody plans on dying. You're planning for your future. And she's kind of a freak. Short. And she received her payments back, her premium payments back on her individual plans, right? She did receive them. I don't know if we actually cashed that check or not, but $2,000 payment. I know that that was men life's payment. They gave her back $7,000 worth of premium for the five months or so that they paid, which also is somewhat of an odd thing because there's no doubt that she needed the group policy for the months of November to December because people, I guess, at the level they say, you're back on the group, they said you're back on the group as of December 23rd. And, in fact, she had not been working since October 1st. So she was really off the loop from October 1st until December 23rd. Her life, I guess, was generous in returning that premium anyway. But during that period, she had no coverage, which would have created a mess, probably, if she had some money. Maybe we should hear from her. I would love to refer you to her. That would be great. Thank you. Let's hear from Kelsey for advice. Good morning. Good morning, Your Honors. Ryan Nelson for Appellate Investment Life. Appellants want payment under both the conversion policy and the plan, and that's exactly what the plan recommends. With that context, I want you to go ahead. Yes, Your Honor. Okay, I'm going to go for a minute. But my burning question for you is a really technical one, and I'm going to tell you what's going on with the programs. I mean, this just comes to us as a risk of preemption. So the question is, what if we're, of course, going to be called upon to approve this, and we can't get permission to do it. And I'm going to put it on the table, so I don't look at the group policy, and I don't really see anyone here that will give permission. But let's just take a look at that link, because it seems to me it just says my plan here, given probably the state that I am currently in. So it says, if we have issued a personal policy under a right to obtain a personal policy of life insurance, which is what happens with the conversion policy, we will be a death benefit under the group policy, only if that policy is returned to us, and if it returns to us, the conversion policy will be. So I guess I could see that, again, and then, of course, we'll refund that in the three days. But what happened here is that we're finally on the group policy. So this one payment only provision is no longer in effect. We basically waived our right to a 60-point return on the individual policy before payment of the group policy. So the one payment only provision is now out. All we have is the individual policy. That policy, however, argues that it's not covered by the group policy. It doesn't itself have a one payment only provision. It also seems to me she's entitled to pay more for the payment of that. Now, if you did it in the reverse, if you gave her on the individual policy and said, hey, given that you're a danger to the individual policy, we're not required to pay you on the group policy, then, of course, we have to interpret the plan, which we'll figure out whether that interpretation was right, and it would be corrected by reason. So that's why I'm inclined to think that you do this, but it's totally up to you. So two more times. So first, I would need to go back and double-check. I know there are two different prohibitions on double payments within the plan, and part of the reason that I would need to go back and double-check is that appellants now raise the argument that the prohibition on double payment within the plan would not apply here. Their whole argument is to look at the plan, not that the plan itself would not work at this time. Once we look at the plan, once we're interpreting that one payment provision to see if it's applicable here or not applicable here, is that all it takes for a risk of preemption that we have to? In other words, it's related to the plan? Yes, because the claims that they're seeking relate to the conditions imposed by the plan and not just one double prohibition payment or the two different provisions of the plan that prohibit double payments. But you're correct, Mark. It's because you have to look at the plan. And that's the key. The key is that a risk of preemption, the state law claims, because those state law claims relate to the conditions of payment that are placed by the plan. So there's both binding authority and persuasive authority here. The binding authority, briefly, is the title. If you're familiar with it, it just says that there are a reciproate of state law claims that relate to the ERISA plan. And appellants make a lot of hay out of the wax case, which we argue is not on the ERISA statutory law. In wax, the court held that there is no reciprocation because the conversion policy is, quote, independent of the ERISA plan and does not place any burdens on the plan administrator or the plan provider. And, of course, appellants, I mean, if you're looking for a record, you'll find the ERISA plan somewhere. Respectfully, are we claiming both provisions in the plan? Two prohibits. They don't have another provision you're talking about. So I am not looking at one. That is, all I have is the exception to one plan, and only I don't know where. I don't think I'm really going to be able to see that thing yet. Can you tell me where is the other one? Yeah, you're supposed to look at it. Sure. Well, it is the provision in Section A that says no death benefits are payable. If a death benefit is payable under the right to obtain a personal policy of life insurance on your own life, I don't know that that changes anything. I agree it looks like you did it backwards, that you should have demanded that they return the individual policy and say, no, we're not going to pay you under the group policy until you return it instead. It looks like you paid and then simply canceled out. So I don't know if that's a technical problem or if you ignored the language. I think that, in fact, you might have been too generous because if you paid under the individual policy, they wouldn't have the right to return a premium. So you might have said, well, we won't give her her premium. She actually will pay the group policy and won't pay under the other. Correct. And you're correct on your reference, Section A. So I'll read the language. So it's Section A of the Continued Protection coverage section of the plan. Note, and agree with me, there are some parts here that are bracketed for references. No death benefits are payable under the plan. If a death benefit is payable under the section of the plan entitling certain participants to a conversion policy. So to your Honor's point, Section E is the reverse of that. It says, if we pay it in one way, it can get death benefits both ways. Section A is the reverse. It says, if we pay it the other way, you also cannot get double payments. That's why both sections read in tandem essentially just prohibit the numbers that we're getting in there. I don't know if that would be good. Sure. And no death benefits are payable, and in brackets, under the plan. This is a very far-fetched language. If a death benefit is payable under, again in brackets, the section of the plan entitling certain participants to a conversion policy. So based on Section A and Section E, the double payments are prohibited. And the Fourth Circuit dealt with very similar cases in this complaint, which, branching off of our mandatory authority here, going briefly to persuasion, I think lays the most applicable case here In white, the court held that ERISA preempted the state law claims because those claims related to the conditions placed by the plan on the right of conversion. Similar here, it called state law claims related to the conditions placed by the plan on payment. So it settled, for instance, what the conditions are the plan is placing. And based on that ruling, we believe that ERISA likewise preempts the state law claims here. Now, the Kurgoski case of the Eastern District of Pennsylvania held similarly. We won't go through all the facts of that case. The Dillon case of the Southern District of New York, very similar facts, similar holding, in that ERISA was found to preempt the state law claims, but slightly different language. And that's like difference is immaterial here because under either of these, ERISA will preempt the state law claims at issue. But it's worth referencing that language that the language in the Southern District used is that state law claims implicated the consequences of the conversion process under the plan. And that's what we have here. Appellant's state law claims implicated the consequences of the conversion process, which is that he can't pay any more money. So under the authority that we have of finding a persuasive ERISA should preempt the state law claims here, it is also worth the reason to mention the public policy arguments that if appellant's state law claims were granted, we'd be right back where we are now. That we would pay out debt benefits under the conversion policy if their claims were granted. But the Department of Labor has held that there is a requirement that a claims judiciary like MetLife seek over-paid benefits under the plan. So we grant the conversion policy, and then we go back and we are sent into more litigation where the appellants were propounding litigation. And appellants get a windfall here because MetLife and appellants all get bargained to pay out the debt benefits once. So let me ask the same question. I'm going to ask the same question. What's your comment about what's the purpose of furking $1,400 a month for what I gather you're saying is the bad side, right? So it wouldn't have been too rich if the state did the conversion policies. You've got the group coverage when you're employed. I'm just joking. That's just the material. It's not amazing. I'm talking about when your client decided in January or February, right? So they already basically said, no, you can't have both. So she comes back and says, well, wait a minute. Is there any chance I can keep paying on it? I want to keep it in place. And you all said, yeah, sure, give us that money and we'll keep it both. So I'm trying to figure out if you're right, that there were no circumstances in which if she died, she was going to get paid out of her book. What was the answer of getting out of her book? You're correct. There was no purpose in collecting the premiums. My life made a mistake on collecting the premiums. I'm sorry. I'm just saying you can't do that. And so why is it that there's some kind of a stop and go? Why wouldn't she be able to say, look, I don't know what her medical condition was at the time, but let's assume that she was somehow still curable. And she said, you know, I realized that the $470,000 I had on the group policy was not enough. I don't think it's enough. So I was going to get an additional $470,000 to cover one part or the other. I relied to my detriment on your guys' representation that somehow I could keep them in place both. But I didn't believe that I was going to cover each other both. And I basically, you know, for one, I'm not going to even require insurance, whether insurance funds or not insurance. And so how do you opt to take both? Because I understand that you would have to. Sure. So the reason is because, and this is a big argument. It's a valid sentence that MetLife's agents represented that you could have both in place. That's a material fact, because there are no oral modifications to recent plans permitted. In the circuit, Bridgerton versus Pension Plan and Bethlehem still hold that option. See, the fact that MetLife's agents said something, or I should say are alleged to have said something here. There's a question of whether it would have been admissible in the first place. But the fact that MetLife's agents are alleged to have said something here is not a written modification to a recent plan. It's not allowed unless there's a written modification, because there isn't. There was no proper rebuttance, which I think gets to your sophomore question. No, actually, I don't think you're right on that. There's no modification of a plan. You're just discomfort in citing a plan for a pension built by a payment because of actions that you're going to. That's just basically what I'm talking about. I don't think there's a modification to a recent plan, so. Well, then, if, sort of a swing argument, that we can pass the modification case. Appellants do not plead estoppel. And this court, or not this court, but I'm sorry, but the courts have held that Carissa Fram's state law estoppel claims. And I guess there were both of those reasons that the estoppel argument wasn't made. Number one, it simply wasn't defeated. And number two, even if it were to have been defeated, Carissa Fram's those as well. How they're cited in our brief section. Well, I think the recent plan terms are ambiguous. And you have an oral misrepresentation of those terms. Those two factors combined can lead to estoppel. Can they not? Is the estoppel case a federal law claim? You're correct on that. Yes. And the terms would need to be ambiguous, though. So if you have clear terms in your plan, even if you didn't see them as so clear when you made it out, then you're saying, in that instance, estoppel wouldn't apply. Correct, Your Honor. So if TLUA estoppel would apply here, it is first, if they had been defeated. And second, if the plan terms were in any way ambiguous. And then, in theory, if we get past both of those hurdles, the estoppel argument would apply. We don't get past either hurdle here. In the time I do have remaining, I wanted to just briefly address two of the additional points that appellants raised. First was this argument that the conversion policy was supplemental coverage, that it was additional coverage, so that she could have as much life insurance as she wanted. We certainly don't argue that you can't have as much life insurance as you want. We argue that this conversion policy was an example of that. The appellant, excuse me, the decedent, checked the box in her application for the conversion policy and said, quote, group conversion. And we cite two of the people in each area. Our brief that explains the conversion clearly means a fixed forming from one thing to another. This was not supplemental coverage. This was a conversion. It was a change to something. And the second point is this argument that MetLife is trying to seek rescission of the policy. We're making no such request. We're not arguing that the conversion policy should be rescinded here. We're simply relying on the text and interpretation of ERISA. ERISA preempts you, because the state law claims, as Your Honor mentioned earlier, relate to impugnations of the plan. And because ERISA relates to those state law claims, the claims must be preempted. Thank you.  Thank you, Your Honor. Thank you, counsel. Do you have some time for rebuttal? We have the area. I'm going to start with the report plan. The plan is dissolved. It doesn't exist. It existed. It existed then, but it doesn't have, in order for something to be preempted, it has to have a current effect on the administration or funding of a plan. The plan is gone. If MetLife has to pay $500,000 now under some individual policy that it made misrepresentations to get premium for, so be it. If it's just a regular life insurance policy like recorded Hodgson versus Banner Life from California, it could be new. It could be an issue of whole life policy. The plan is never coming back. If they get money back, then I'll send an overtake fund or anybody to say, hey, your plan now has a $500,000 deposit balance. I think that the entire boat of preemption is based on the fact of there's no plan. And I think in order for there to be preemption, there has to be a plan that's preempted. Next, I'd like to briefly address the case that's most important to MetLife's view. Chris White made a huge difference. Chris White made misrepresentations to get the policy. And when Kauffman found out about it, they took it away. He didn't doubt it. He just made this thought that that wasn't a very big issue. I think that's a huge issue. Because again, it shows by the fact that Mr. White filed a tenuous declaratory rejection and said, hey, you gave me a policy that's been two years. You owe me a policy. I cannot imagine compelling a insurance company that says, you have to insure me. After you die, this isn't you have to insure me. This is now a breach of contract. You have to pay the death. And that's made a huge, huge difference. MetLife also relied on one of their other cases called Dillon. Dillon was a man down in the New York area. And Peter Dillon, being the employer and the second policy that was never issued, it was a matter of days where they told Dillon that your employer didn't pay the premium, so you've got to pony up $2,300 right now. And they did that. And then Dillon's employer, within a year or two, came in and said, hey, we made a mistake. Here's the premium. He's still an active employee. Put it back on. And then unfortunately, Mr. Dillon died three days later. And the group client paid him. And yes, Mr. Dillon did say, well, now you owe me the money. But there was a quote in the brief by a building that says, the court noted, if there were $2 issued, then I may have to pay. So we don't have enough information from the Metro. Blackfoot, your response to your opponents in Silicon Valley was on the estoppel point. On the estoppel point? Well, I think she says you never paid. I don't know that all of those are true. We have an action to declare it a relief. I think that is to take counsel to the court to declare the rights and liabilities of the party. So I think the estoppel was a clear answer to why you were in trouble. I think we could not have done that. Visibly, we chose men. We never got very far on the billions because we had the circulation. So I don't know if that is a very big issue. Usually, the estoppel isn't from the defense. It would come down, strangely, at this set of facts. Any other issue that you want to be able to speak? I mean, I just have to comment that threatening to sue us for minority is something that I just find horrible. Had they paid the individual policy, we'd have a RISA claim here. And we would be happy to have litigated whether it was an issue due to a RISA, what the plaintiff would have said, whether he said it was the policy and having one payment plan within a RISA plan, but then not paid, we would have been happy to litigate that. They made that choice. They did themselves here. That's great. Thank you very much, Delfo. I appreciate your helpful arguments in this case. And so Reynolds versus Netsch. Both of my attorneys go to UCF. Yeah, that's correct. My colleague, who's still driving me to class, is on our calendar, which is Dunson versus Cordes Corporation.
judges: Fernandez, Watford, Staton